FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

01 JAN 18 PM 3: 47

U.S. DISTRICT COURT
N.D. OF ALABAMA

DAVID L. STURDIVANT,                    )
                                        )
    Plaintiff,                          )
                                        )
vs.                                     )        CV 00-BU-1450-S
                                        )
USX  CORPORATION,  UNITED               )        **ENTERED**
STATES  STEEL  DIVISION,                )
FAIRFIELD WORKS,                        )        JAN 1 8 2001
                                        )
    Defendant.                          )

## MEMORANDUM OPINION

This case is presently pending before the Court on Defendant's Motion for Summary Judgment. (Doc. 13) Plaintiff David L. Sturdivant alleges that he was terminated by Defendant USX Corporation, his former employer, in violation of Title VII and § 1981 on the basis of his race and in retaliation for filing an EEOC charge. This Court has reviewed the record and finds that Defendant's motion for summary judgment is due to be granted and Plaintiff's claims are due to dismissed.

## I.    SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the Court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986). Summary judgment is weighed heavily in

favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505, 2511, 91 L. Ed. 2d 202 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). A party seeking summary judgment has the initial responsibility of informing the Court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323; 106 S. Ct. at 2553; *see also Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its initial burden, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). In resolving whether a given factual dispute requires submission to a jury, a district court must view the record in the light most favorable to the nonmoving party and resolve all reasonable inferences in the nonmovant's favor. *Rooney v. Watson*, 101 F.3d 1378, 1380 (11th Cir. 1996) (citing *Hale v. Tallapoosa Co.*, 50 F.3d 1579, 1581 (11th Cir. 1995)).

## II.   STATEMENT OF FACTS

Defendant hired Plaintiff on April 13, 1971. Plaintiff was a member of the United Steelworkers of America until his discharge.

During the course of his employment at USX, Plaintiff had a substantial disciplinary history, including the following recent discipline record:

| | |
|---|---|
| 08/06/98 | 3-day suspension for failure to turn off annealing furnace |
| 03/06/98 | 3-day suspension for failure to turn off annealing furnace |
| 11/18/97 | 5-day suspension, subject to discharge for striking a supervisor |
| | 5-day suspension, subject to discharge for failure to comply with a supervisor's instructions |
| 07/14/97 | 1-day suspension for poor workmanship |
| 10/29/96 | 5-day suspension, subject to discharge, for falsification of hearing record |

On November 15, 1997, Plaintiff was disciplined based on alleged altercation with his supervisor, and he was removed from the Annealing department. As a result, on November 18, 1997, Defendant issued Plaintiff two concurrent five-day suspensions, subject to discharge, for striking a supervisor and for failure to comply with a supervisor's instructions. After a hearing on November 21, 1997, Plaintiff's suspensions were converted to a discharge. Pursuant to the collective bargaining agreement between Defendant and Plaintiff's union, Plaintiff filed grievances protesting the suspensions and the discharge. After a hearing, the parties – including Plaintiff – entered into a "last chance" agreement, which reinstated Plaintiff pursuant to certain conditions of continued employment.[1] This agreement states:

---

[1]Plaintiff contends that he was reinstated because he "was innocent of any wrong doings in regards to the November 15, 1997 incident." Doc. 19, Exh. 1, p. 1. However, the last-chance agreement states that Plaintiff was reinstated because of his length of service and his work record and because the altercation "was partly due to an alleged ongoing conflict between [Plaintiff] and the Supervisor, for which the Union asserted the Supervisor was not totally blameless." Doc. 15, Exh. 5, p. 1. The agreement states that Plaintiff was reinstated; nevertheless, he was suspended for the incident. It is clear and unambiguous that the last-chance agreement, which allowed Plaintiff to return to work, was not based on Plaintiff's absolution of any wrong doing.

> You are hereby advised that this will be your _final_ opportunity to become a satisfactory employee, and a _final_ warning if you are again guilty of _any_ rules infraction, your discipline could lead to a 5-day suspension, subject to discharge, and in which case Management will not be inclined towards any further leniency on your behalf.  Any violation of the terms of this agreement could lead to a 5-day suspension subject to discharge without your being offered the rights spelled out in [the collective bargaining agreement].  Your signature below is an acknowledgment that you have read, understand and willingly accept the requirements of this agreement.

Doc. 15, Exh. 5, pp. 2-3 (emphasis in original).  Plaintiff signed the last-chance agreement.

After receiving the last-chance agreement, Defendant disciplined Plaintiff for failing to turn off a furnace on March 4, 1998, and again on August 8, 1998.  On May 26, 1999, allegedly as a result of Plaintiff's unsatisfactory work and his failure to timely fire furnace 6-A on May 22, 1999, Plaintiff received a five day suspension, which was converted to discharge on June 2, 1999.

On the night of the incident that led to his termination, Plaintiff worked the 11p.m. to 7 a.m. shift as the Box Annealing Operator.  Plaintiff arrived at work on May 21, 1999 at approximately 11:00 p.m.  Because the prior shift was running behind, furnace 6-A was not ready to be fired when Plaintiff began his shift.  It was Plaintiff's duty to purge the base, and then later to fire furnace 6-A.  Also, Box Anneal Operators have worksheets regarding duties and statuses of the furnaces, and Plaintiff's worksheet indicated that furnace 6-A was ready to be fired.  However, Plaintiff testified that it was not ready to be fired at the time he started his shift and,

"It was not my job to stand at position 6-A and wait for his crew to finish readying position 6-A for firing."  Doc. 19, Exh. 1, p.2.  Plaintiff states in his affidavit:

> [T]here was nothing on my work sheet that said that position 6-A had to [be] fired immediately upon being made ready to fire.  If it did, or had Mr. Praytor . . . told me to stand there and make sure it got fired first before doing anything else, then I would have stood right there waiting for them to finish the work on 6-A and then when they finished it, I would have purged and fired the furnace.  But that's not how it happened at all.  Instead, the hooker came to me and informed me that 6-A was ready to be fired, while I was performing another task.  I went down to the 6-A furnace as soon as possible and purged it (You cannot fire a furnace before purging it).  It takes about an hour for the furnace to purge.  After I purged it, I fired it, along with the other furnaces.

*Id.*  Company records indicate that furnace 6-A was not fired until 5:00 a.m.; Plaintiff contends that this is because it must have gone out after he fired it.   The failure to timely fire furnace 6-A caused a delay in Defendant's production.

Plaintiff testified that he started the process of firing furnace 6-A about 1:00 a.m. and that he stayed with the furnace to make sure it was firing properly.  Plaintiff admitted that when he checked the furnace at about 4:30 - 5:00 a.m., he had to reset the recipe because the furnace was not burning properly.  Plaintiff did not check the furnace earlier because he was busy with other work.

Following this incident, Scott Coleman, Area Manager - Sheet Finishing, was primarily responsible for the investigation of the circumstances on behalf of USX.  Coleman concluded from his investigation, including reviewing temperature data on the Pyrometer Readings Report, that furnace 6-A was not fired until 5:00 a.m. on May 22, 1999.

Based on his alleged failure to timely fire the furnace, Defendant informed Plaintiff that he was suspended Plaintiff for five days, subject to discharge. Plaintiff filed a union grievance protesting this discipline.

In accordance with the provisions of the Basic Labor Agreement, the company and the union conducted an "8-B" hearing on June 1, 1999. The purpose of the 8-B hearing is to provide a full review of the facts prior to terminating an employee. Present at the 8-B hearing were Plaintiff, as well as his union representatives. Defendant was represented by Coleman, a shift manager, and Defendant's labor relations representative.

Defendant presented an Hourly Pyrometer Readings Report regarding furnace 6-A at the 8-B hearing. The report indicated that furnace 6-A was fired at 5:00 a.m. on May 22, 1999. Defendant also presented a computerized archived Base 6-A Trends Report at the hearing. The Base 6-A Trends Report also indicated the furnace was fired at about 5:00 a.m.

A signed statement from shift manager Gary Ray was presented and read into the record at the 8-B hearing. Ray was the shift manager on the B shift, 7:00 a.m. to 3 p.m. on May 22, 1999. Ray stated that Plaintiff told him on that day that he had fired furnace 6-A at 3:30 a.m. At the 8-B hearing, Plaintiff testified that he helped craneman Parham and utilityman Meadows turn coils, and that he fired three single stack furnaces by 1:00 a.m. Plaintiff claims he helped Parham, who was having trouble performing his job duties, until 3:00 or 3:30 a.m.

Plaintiff further testified at the 8-B hearing that he fired furnace 6-A, but had to restart it at about 4:00 a.m., as it was not firing correctly. Plaintiff testified that the Hourly Pyrometer Readings Report was in his handwriting. When asked why he wrote down 5:00 a.m. on the Hourly Pyrometer Readings Report as the time he fired furnace 6-A, Plaintiff stated that if it was after 4:00 a.m, he had to "go over to the next hour" and that he had to write down the time the furnace was actually fired, not the first time he attempted to fire it. Plaintiff further testified that Ray did not ask him what time he fired furnace 6-A the morning of May 22, 1999.

After the 8-B hearing, Plaintiff's suspension was converted to discharge. Plaintiff, on June 3, 1999, filed a grievance protesting his discharge.

Pursuant to the Basic Labor Agreement, a second step meeting was held on July 16, 1999, to consider whether Plaintiff was discharged for proper cause. At the second step meeting, Plaintiff testified that he had helped Parham turn two coils, one with a broken band. Plaintiff presented a written statement by Parham. Plaintiff testified, for the first time, that he had to find and mark two coils, as well as fix a problem with a purge valve on a single stack furnace base, prior to firing furnace 6-A. Plaintiff testified that he had fired three single stack furnaces prior to 1:00 a.m. Any problems with single stack furnaces were resolved prior to 1:00 a.m., or Plaintiff would not have been able to fire them.

Coleman, on behalf of Defendant, testified at the second step meeting that the additional work done by Plaintiff should have taken only a minimal amount of

time, that turning coils was not Plaintiff's job, and that neither job had priority over firing furnace 6-A.

Plaintiff's recent discipline record was reviewed at the second step meeting. Defendant denied Plaintiff's grievance, stating that Plaintiff had "accumulated a deplorable discipline record, including a last chance agreement and progressive discipline for unsatisfactory work." Doc. 15, Exh. 4, p. 4.

Plaintiff appealed the denial of his grievance to arbitration and, pursuant to the Basic Labor Agreement, the parties arbitrated Plaintiff's claims on December 8, 1999. Plaintiff was represented by his union representatives, and was afforded the opportunity to testify and to call witnesses at the hearing.   The Union, on behalf of Plaintiff, introduced some other documents that indicated that the furnace may have been lit, but that "it was not running right." Doc. 15, Exh. 1, pp. 270-71. Greg White, Grievance Committeeman Local Union 2122, testified at the hearing that Cary had said to him, after Plaintiff was suspended, that "he would go after Mr. Sturdivant full steam, that he had him this time." Doc. 19, Exh. 3, p. 459.

On February 16, 2000, the Board of Arbitration denied Plaintiff's grievance. Plaintiff worked until the Board of Arbitration denied his grievance.

The Arbitrator noted "that it is a well-known and accepted expectation that the Box Annealer is to fire furnaces in an expeditious manner.  This is the primary function of this position, and because annealing is a bottleneck in the production process, accomplishment of this task is rather important." Doc. 15, Exh. 14, p. 2.

The critical question for the Arbitration Board related to the time Plaintiff actually fired the furnace. Plaintiff testified at arbitration that he fired furnace 6-A at "12:00 midnight or 1:00 a.m., that the furnace must have gone out later and that the notation at 5:00 a.m. [on the Pyrometer Readings Report] just reflected he was behind in his paperwork." *Id.* at 3. Fellow union employee Anderson testified that it was his opinion the temperature data for furnace 6-A "could mean there was an attempt to fire the furnace early in the shift but the furnace went on idle or low flame." *Id.* In weighing the evidence as to when the furnace was fired, the Arbitration Board found the Company's evidence more convincing. The Arbitrator held:

> The Board also found the Grievant's shifting claims troublesome as well. Even if he could be believed that he fired the furnace at 1:00 a.m. and even if Mr. Anderson's speculation was correct and the furnace went to idle, the Grievant did not satisfactorily explain why he did not discover the furnace was not working properly during the hourly checks he is supposed to do and record. He didn't discover any misfire because, not only did he not fire the furnace, he didn't do hourly checks of base 6A between 11:00 p.m. and 5:00 a.m. when he finally fired the furnace.

*Id.* As to whether Plaintiff's discharge was a proper penalty, the Arbitration Board found that Plaintiff's disciplinary record should be considered.

> Having 28½ years of service is powerful mitigation. However, the Grievant was given the benefit of this when he was afforded reinstatement in 1997. He was put on notice that further leniency was not guaranteed. It is not insignificant that the 1997 Last Chance Agreement was preceded by another serious incident in 1996. A five-day suspension was issued and later converted to discharge. It was settled at the third step on October 20, 1997 by reducing the matter to

a five-day suspension.  Most pertinent from the settlement is the acknowledgment that the offense (falsification of records) was one where discharge would be appropriate and that the company would not be inclined to further leniency.

Thus, in determining whether termination is appropriate it cannot be ignored that Grievant twice before had been at, over and back from the brink of discharge.  His last chance in 1997 actually represented a second chance after his 1996 misconduct.  Even so, the Company did not, following the 1997 Last Chance Agreement, seize upon his first miscue as a basis for discharge.  He was given two more opportunities to correct his performance.

*Id.* at p. 5.  With respect to Plaintiff's disparate treatment argument, the arbitrator further held:

The Board is convinced that Grievant was not a victim of discriminatory treatment.  To show that the other employees in Box Annealing were treated differently, the Union would have to show that they had similar disciplinary records as Grievant.  A poor work record, especially one with so may serious incidents, is a valid basis to impose a harsher penalty on one employee and not others.

Absent proof to the contrary, the Board is left to conclude that Grievant's record was significantly worse than other employees who had production problems.  In light of the Grievant's overall record, particularly the Last Chance Agreement, it cannot be said that discharge is unreasonable or improper in spite of his significant years of service.  His years of service gave him the benefit of several chances before.  However, the accumulated weight of so many disciplinary matters, some extremely serious, has unfortunately finally negated the mitigation of his seniority.

*Id.* at 5-6.

Plaintiff also filed for unemployment compensation as a result of his discharge.  The State of Alabama Department of Industrial Relations concluded that Plaintiff should be disqualified from benefits because Plaintiff had engaged in

misconduct after prior warning.  Indeed, the State held:

> The evidence shows that claimant failed to timely fire a furnace resulting in a considerable loss of production money to the company. It is clearly evident that it was his responsibility not only to fire that furnace but to keep a check of it and to keep records as to its operation. The claimant failed to perform those functions satisfactorily. Therefore, he was discharged for misconduct.  The evidence also shows that the claimant had previously been warned and suspended for related workmanship offenses.  Therefore, he is subject to a disqualification under this section of the Law.

Doc. 15, Exh. 25.

Plaintiff filed a charge of discrimination concerning his discharge on February 25, 2000.  In his charge, Plaintiff asserted that he was discriminated against "in retaliation for having filed previous EEOC charges against the employer" and because he was "also a party in a law suit filed against the employer."  Doc. 15, Exh. 26.  Plaintiff further stated in his charge: "On June 2, 1999, my suspension was converted into a discharge."  *Id.*  The EEOC determined that Plaintiff had waited too late to file his EEOC charge, his charge was untimely and issued a dismissal and notice of right to sue on March 1, 2000.

Prior to his discharge, Plaintiff had filed two charges of race discrimination with the EEOC – one in 1984 and one in 1998.  Plaintiff filed suit on his 1998 charge, which alleged racial harassment.  Plaintiff claims that the furnace firing crew had only one white worker and was referred to by white foremen as the "nigger crew."  This matter was settled in 2000.

Plaintiff testified that he believes he was discharged for filing EEOC charges

because:  (1) he claims he was not guilty of the charges upon which his discharge was based; (2) he claims he has spoken up as a Civil Rights worker; and (3) he claims a white employee, Alan , was treated differently.  Plaintiff alleges that Moore deliberately failed to turn off furnaces when they were scheduled to be turned off and also deliberately turned off furnaces earlier than they were scheduled to be turned off.  Plaintiff believes his job was filled by a white employee, but when there is a vacancy the senior qualified employee just steps up to fill the position.

Alan Moore, a white employee, is a Box Annealer Operator.   Moore received the following discipline:

| | |
|---|---|
| May 21, 1999 | Unsatisfactory Work (discipline removed during grievance process) |
| May 19, 1999 | Poor workmanship |
| Nov. 23, 1981 | Safety - Failure to wear safety goggles |
| Feb. 8, 1980 | Safety - Careless operation of crane. |

However, Moore was not working under a last-chance agreement.  Also, he did not have a discipline record similar to Sturdivant, and he had never been charged with failing to timely fire furnace 6A.

## III.  DISCUSSION

### A.   TITLE VII CLAIMS

Defendant contends that Plaintiff's Title VII claims are barred because Plaintiff failed to timely file his EEOC charge after he was discharged.  Plaintiff contends that

the date for purposes of determining whether he timely filed an EEOC charge should be the date of the arbitration decision, which was the day he stopped working, and not the date of the termination decision.

Because Title VII provides that a charge of discrimination shall be filed within 180 days of an "alleged unlawful employment practice,"[2] an internal and private grievance/arbitration procedure for contesting such "unlawful employment practice" does not toll the running of the statute of limitations for filing a charge of discrimination with the EEOC. *Delaware State College v. Ricks*, 449 U.S. 250, 261, 101 S. Ct. 498, 505-06, 66 L. Ed. 2d 431 (1980)(citing, *inter alia*, *Electrical Workers v. Robbins & Myers, Inc.*, 429 U.S. 229, 97 S. Ct. 441, 50 L. Ed. 2d 427 (1976)); *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 797 (11th Cir. 1992); *Stafford v. Muscogee County Board of Education*, 688 F.2d 1383, 1388 (11th Cir. 1982); *Bevill v. UAB Walker College*, 62 F. Supp. 2d 1259, 1278 n. 11 (N.D. Ala. 2000); *Sumner v. Michelin North America, Inc.*, 966 F. Supp. 1567, 1584 (M.D. Ala. 1997).

The "alleged unlawful employment practice" in this action is Plaintiff's termination, which occurred -- at the latest -- when Plaintiff's suspension was converted to discharge on June 2, 1999.  Plaintiff did not file a charge of discrimination until February 25, 2000, which is more than 180 days after the

---

[2]42 U.S.C. § 2000e-5(e)(1).

alleged unlawful employment practice occurred.   Therefore, Plaintiff's Title VII claims of race discrimination and retaliation are barred and are due to be dismissed.

### B.   SECTION 1981

#### 1.   Racial Discrimination

In *Nix v. WLCY Radio/Rahall Communications*, 738 F.2d 1181, 1185 (11th Cir. 1984), the Eleventh Circuit Court of Appeals held that a plaintiff can establish a prima facie case of discriminatory discipline by showing that (1) he is a member of a protected class; (2) that he was disciplined; and (3) one of the following:

a.      he was "replaced by one outside the protected class;" or,

b.      the discipline imposed on him was more harsh than that imposed on similarly situated employees outside the protected class for nearly identical conduct.

*Id*. at 1185;    *see also Vickers v. Federal Express Corp.*, No. 98-2112-CIV-HOEVELER, 2000 WL 1725356, *5 (S.D. Fla. Oct. 26, 2000)(citing *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir.1997); *Joseph v. Publix Super Markets, Inc.*, 983 F. Supp. 1431, 1444 (S. D. Fla.1997)).

The parties have not presented any evidence regarding the race of Plaintiff's replacement; therefore, Plaintiff has the burden of demonstrating a prima facie case of discriminatory discipline by proving he was disciplined more harshly than similarly-situated employees outside the protected class for nearly identical conduct. Plaintiff argues that he was treated more harshly than white employee Alan Moore

for his failure to timely fire furnace 6-A.

Plaintiff has the burden "'to show a similarity between [his] conduct and that of white employees who were treated differently and not on [the defendant] to disprove their similarity.'" *Jones v. Gerwens*, 874 F.2d 1534, 1541 (11th Cir. 1989)(quoting *Tate v. Weyerhauser*, 723 F.2d 598, 603 (8th Cir.1983), *cert. denied*, 469 U.S. 847, 105 S. Ct. 160, 83 L. Ed. 2d 97 (1984)).

Plaintiff contends that Moore failed to fire furnace 6-A during his shift and that he was not terminated. This, he claims, shows that a white employee – Moore – was treated more favorably. Defendant contends that Plaintiff is not similarly situated to Moore because Plaintiff and Moore did not have comparable disciplinary histories.

The Court notes that in cases where the employer has and applies a progressive discipline policy, employees are not similarly situated if they are at different steps in the progressive disciplinary policy. *Jordan v. Warehouse Services, Inc.*, 81 F. Supp. 2d 1257, 1268-69 (M.D. Ala. 2000). However, Plaintiff contends that he and Moore should be considered to be at the same step because "Moore has a history of not firing his furnace properly, his supervisors knew about it, and no discipline was taken." Doc. 18, p. 12. Plaintiff argues that "Moore had less of a disciplinary history on paper only . . ." and that Moore's work rule violations were ignored. *Id.* at 14. Nevertheless, Plaintiff has not presented substantial evidence that Moore's work history was as fraught with work rule violations as was Plaintiff's

work history or that Moore was working under a last-chance agreement.  As set forth above, in the three years before his termination, Plaintiff was disciplined for such serious offenses as falsifying records and insubordination, in addition to failing to turn off furnaces on two occasions in 1998, after he had signed his last-chance agreement.  Moore was disciplined for unsatisfactory work on two occasions in 1999 and for two safety violations in the early 1980's.  Plaintiff alleges that Moore failed to perform his job duties on many more occasions; however, the record does not contain substantial evidence that Moore's supervisors were aware of these violations and failed to discipline him accordingly.

In short, Moore and Plaintiff are not similarly situated because Plaintiff's work rule violations and disciplinary history for the three years preceding his termination were much more serious and severe than that of Moore.  Thus, Plaintiff has failed to establish a prima facie case of race discrimination with regard to disparate discipline.  Plaintiff's claim that he was terminated on the basis of race in violation of § 1981 is due to be dismissed.

### 2.    Retaliation

For purposes of deciding the motion for summary judgment, the Court assumes that Plaintiff can prove a prima case of retaliation.  *See Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir. 1999)(citing *Clover v. Total System Services*, 176 F.3d 1346, 1354 (11th Cir.1999)).  Nevertheless, Plaintiff cannot show that Defendant's articulated reason was a pretext.

> Once a plaintiff makes out a prima facie case of retaliation " 'the burden shifts to the defendant to rebut the presumption of retaliation by producing legitimate reasons for the adverse employment action.' If the defendant offers legitimate reasons, the presumption of retaliation disappears. The plaintiff must then show that the employer's proffered reasons for taking the adverse action were actually a pretext for prohibited retaliatory conduct." *Sullivan v. National Railroad Passenger Corp.*, 170 F.3d 1056, 1059 (11th Cir.1999)(quoting *Raney v. Vinson Guard Service*, 120 F.3d 1192, 1196 (11th Cir.1997)) (citation omitted), *cert. denied*, 528 U.S. 966, 120 S. Ct. 402, 145 L. Ed.2d 314 (1999).

*Johnson v. Booker T. Washington Broadcasting Service, Inc.*, 234 F.3d 501, 507 n.6

(11th Cir. 2000).

Defendant contends that Plaintiff was terminated based on a work rule violation -- his failure to timely fire furnace 6-A – and his past history of discipline. Plaintiff contends that this reason is a pretext because he did not fail to timely fire furnace 6-A and that any delay in firing the furnace was not his fault. In other words, Plaintiff contends that he did not violate the work rule that is the basis of his discharge.

There is precedent in this Circuit for finding such proof sufficient to support a finding of pretext. The Eleventh Circuit, in *Damon v. Fleming Supermarkets*, 196 F.3d 1354 (11th Cir. 1999), held, "On summary judgment, we have written that the 'work rule' defense is arguably pretextual when a plaintiff submits evidence (1) that she did not violate the cited work rule, or (2) that if she did violate the cited work rule, other employees outside the protected class, who engaged in similar acts, were not similarly treated." *Id.* at 1363 (citations omitted). However, the District

Page 17 of 21

Court for the Middle District of Alabama has recently distinguished this case, holding

that a plaintiff may show pretext by showing that he did not violate the work rule only

in cases "where the decisionmaker observes the alleged work rule violation and,

thus, has personal knowledge thereof." *Sweeney v. Alabama Alcoholic Beverage*

*Control Board*, 117 F. Supp. 2d 1266, 1272 (M.D. Ala. 2000).  The district court

explained in rationale as follows:

> [T]he court finds that Plaintiff's denial that she violated work rules is insufficient, in and of itself, to raise a jury question as to whether the ABC Board's reasons are a pretext for discrimination.  The court reaches its conclusion for the following reasons.
>
> In *Sweeney I*,[3] the court correctly stated the law from *Damon*. As stated, the *Damon* Court held that, in a discrimination case where the employer asserts that the employee violated a work rule, the employee may show pretext by demonstrating that he or she did not violate the work rule. *Sweeney I*, 94 F. Supp.2d at 1257-58; *Damon*, 196 F.3d at 1363. However, upon reconsideration, the court finds that this first *Damon* method, upon which Plaintiff relies, is inapplicable in this action.
>
> That part of the *Damon* holding, which allows a plaintiff to establish pretext by demonstrating that the work rule violation did not occur, applies in cases where the decisionmaker observes the alleged work rule violation and, thus, has personal knowledge thereof. *See Strickland v. Prime Care of Dothan*, 108 F. Supp.2d 1329, 1334 (M.D. Ala.2000) (Albritton, Chief J.). ***Where, as here, the decisionmaker (i.e., the ABC Board) does not have personal knowledge of the work rule violation, but rather relies on second-hand information that an employee committed the violation, a different rule applies***. In this scenario, an employee cannot demonstrate pretext merely by showing that the work rule violation did not occur and that, therefore, the information relied upon by the decisionmaker is false. *See*

---

[3]94 F. Supp. 1241 (M.D. Ala. 2000).

*Strickland*, 108 F. Supp. 2d at 1333 (citing *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466 (11th Cir.1991)). ***That is because, in cases where the decisionmaker does not witness the alleged infraction, "[a]n employer who fires an employee under the mistaken but honest impression that the employee violated a work rule is not liable for discriminatory conduct."*** [footnote] *Damon*, 196 F.3d at 1363 n. 3; *see also Strickland*, 108 F. Supp.2d at 1333. ***In other words, whether or not a plaintiff actually committed the work rule violations is immaterial on the issue of pretext. Rather, what is material is whether or not the employer believed the allegations to be true, not whether they were in fact true***. *See Elrod*, 939 F.2d at 1470.

[footnote] To the contrary, as stated in *Strickland*, "[a]n employer may not benefit from the distinction drawn between an employer's belief that an employee committed a work rule violation and the factual accuracy of that belief when the actual predicate of such a belief is the personal knowledge of the decisionmaker." 108 F. Supp. 2d at 1333 (citing *Damon*, 196 F.3d at 1364).

***Thus, to establish pretext, the employee must show more than facts establishing that he or she did not commit the work rule violation. The employee must point to evidence which raises a question as to whether the decisionmaker, in fact, knew that the violation did not occur and, despite this knowledge, fired the employee based upon the false premise of an alleged work rule violation***. For example, where the employer relies on a subordinate's report that a plaintiff violated a work rule,

the plaintiff must establish pretext by showing (or, at least, pointing to evidence that suggests) that the employer either did not rely on that report or that the employer did rely on the report but knew it was false. In either case, the plaintiff would have shown that the employer was likely lying about the reasons for its behavior and that, by definition, is pretext.

*Id.*

*Sweeney*, 117 F. Supp. 2d at 1272-73 (emphasis added). The Court finds the rationale of the *Sweeney* Court to be highly persuasive.

In this case, the parties do not dispute that Bob Cary made the decision to terminate Plaintiff.[4]  Moreover, the parties do not dispute that Cary did not observe Plaintiff's alleged work rule violation and that he was informed of the incident after another employee's investigation of the incident.  Indeed, the evidence submitted by Defendant shows definitively that furnace 6-A was not timely fired.  However, Plaintiff has offered evidence regarding the reasons that it was not timely fired and evidence that it was fired earlier than the investigation showed.  Plaintiff has not offered evidence sufficient to show that Cary did not rely on the reported work rule violations or that Cary relied on the report, knowing it was false.  Therefore, Plaintiff's evidence that he did not violate any work rule is not sufficient evidence to establish a question of fact as to whether Defendant's articulated reason for his discharge is a pretext.

Plaintiff has offered evidence that after Plaintiff was suspended, Cary stated that he would "go after Mr. Sturdivant full steam" and that "he had him this time." Doc. 19, Exh. 3, p. 459.  This statement, made after Cary was informed of the work rule violation, does not support an inference that Cary did not discipline Plaintiff because of the reported violation.  Indeed, the statement clearly indicates that Cary seized on the reported violation to take action against Plaintiff.  Nothing in the

---

[4]Defendant does not respond directly to Plaintiff's contention that Cary made the decision to terminate him. However, the record indicates that Plaintiff's notices of discipline was actually prepared by Coleman, the manager that investigated the matter. *See* Doc. 15, Exh. 11.  Nevertheless, there is no evidence that anyone involved in making the decision to suspend and/or terminate Plaintiff actually witnessed the events in question.

statement indicates that Cary did not honestly believe the reported violation or that the reported violation was not the basis for his decision.

The Court finds that this evidence is not sufficient to establish a question of fact as to whether Defendant's articulated reason for his discharge is a pretext. Therefore, the Plaintiff's retaliation claim is due to be dismissed.

## IV.   CONCLUSION

For the reasons set forth above, the Court finds that Defendant's Motion for Summary Judgment (Doc. 13), as to all of Plaintiff's claims, is due to be granted. The Court finds no existing disputed issue of material fact and that Defendant is entitled to judgment as a matter of law.

The Court will enter an Order contemporaneously herewith in accordance with this Memorandum Opinion granting summary judgment in favor of Defendant on all claims of Plaintiff.

DONE this _18th_ day of January, 2001.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE